# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARK ANTHONY ADELL,

                         Plaintiff,

v.                                                          Case No. 14-CV-1277-JPS

RANDALL HEPP,
DR. CHARLES LARSEN,
JODY DEROSA, and HOLLY MEIER,

                                                                      ORDER
                         Defendants.

In this action under 42 U.S.C. § 1983, Plaintiff Mark Anthony Adell ("Adell"), a state prisoner, claims that the defendants violated his Eighth and Fourteenth Amendment rights by failing to afford him sufficient privacy during his medical appointments in March and April of 2014. (Docket #1). Though the Court's screening order in this matter did not find that Adell stated a claim for First Amendment retaliation (Docket #9), Adell argued in support of that claim in his response to the defendants' motions for summary judgment. (Docket #23 at 18-20). Thus, Adell's First Amendment claim is not properly before the Court from a procedural standpoint; but, the Court will nonetheless address the merits of Adell's First Amendment claim, as the defendants have responded to it in their reply. (Docket #27).

Presently before the Court are two motions: (1) Adell's Motion to Supplement the Complaint (Docket #17); and (2) the defendants' motion for summary judgment on Adell's First, Eighth, and Fourteenth Amendment claims (Docket #19). For the reasons detailed herein, the defendants' motion will be granted, thereby rendering Adell's motion moot, and this action will be dismissed.

1.     BACKGROUND[1]

In short, Adell alleges that Dr. Charles Larson[2] ("Larson") violated his Eighth and Fourteenth Amendment rights by allowing a security guard to stand outside, or in the vicinity, of his medical exam room during two appointments in the Health Services Unit ("HSU"). (*See generally* Docket #1, #23). Adell alleges that Larson requested additional security in order to retaliate against him for filing grievances against medical staff. (*See generally* Docket #23). Moreover, Adell alleges that Holly Meier, Jody DeRosa, and Randall Hepp are liable for the same constitutional violations in light of their varying degrees of knowledge, participation, and failure to intervene in Adell's situation.[3] (Docket #23 at 21).

1.1    The Parties

Adell is currently incarcerated at Fox Lake Correctional Institution ("FLCI") and has been since March 11, 2014. (Docket #24 ¶ 2). Prior to FLCI, Adell was incarcerated at Oshkosh Correctional Institution ("OSCI") from

---

[1]The facts are from the parties' proposed findings of fact, unless otherwise indicated. (Docket #21, #24). Where the parties dispute, or object to, the other's findings of fact, the Court will so note. (*See* Docket #23, #24, #28).

[2]In his complaint, Adell refers to the defendant as "Charles Larsen, M.D." (Docket #1 at 1). The defendant, in his declaration, however, spells his name as "Dr. Charles Larson." (Docket #22 at 1). For the purpose of this Order, the Court will refer to the defendant as "Dr. Charles Larson" or simply, "Larson."

[3]Specifically, Adell claims that both Jody DeRosa and Holly Meier "learned of," "participated in," and "failed to take corrective action" with regard to the alleged constitutional violations. (Docket #23 at 21). He claims that Randall Hepp merely "learned of" the alleged violations and "failed to take corrective action." (Docket #23 at 21). As Adell alleges no facts to suggest any of these three defendants were involved in making or approving the decision to use additional security during Adell's medical appointments, the Court will address their liability in a separate section below.  (*See infra* Part 3.2).

approximately October of 2010 until March of 2014. (Docket #24 ¶ 2). Adell has an extensive medical history and currently suffers from a number of health conditions related to iron deficiency, anemia, a hiatal hernia, prior drug and alcohol abuse, and celiac's disease.[4] (Docket #21 ¶ 12). Adell transferred to FLCI due to his inability to "get along" with the staff at OSCI.[5] (Docket #21 ¶ 11). Though Adell alleges that he has never acted in "defiance" towards prison staff (Docket #23 at 16, 18), Adell's medical records indicate that he has a history of argumentative and uncooperative behavior towards

---

[4]The parties appear to dispute whether this condition has been verified by a colonoscopy. (*Compare* Docket #21 ¶ 12 *with* Docket #24 ¶ 3). However, this fact is immaterial for purposes of the motions now pending before the Court.

[5]Adell contests the truthfulness of this statement. (Docket #42 ¶11). In support, he argues that Larson has insufficient knowledge to make that conclusion and is lying. (Docket #24 ¶ 11). Adell also states that "[n]o transfer records support the [n]otion" that he was unable to "get along" with staff at OSCI. (Docket #21 ¶ 11). However, Adell admits he "transferred from [OSCI] to [FLCI] after filing a great wealth of inmate complaints, state nursing board complaints et al., and was in the process of preparing to seek injunctive relief alleging unethical conduct, negligence and medical malpractice." (Docket #23 at 15). In addition, Adell's medical records contain a letter written by Meier on March 27, 2014, and addressed to Adell. (Docket #28 ¶ 11). Adell admits receiving this letter. (Docket #23 at 17). The letters states that Adell was "transferred to FLCI due to the concern that [he] did not adhere to the care plans at OSCI and did not work with [his] health providers." (Docket #22 Ex. 1 at 46). In light of the Seventh Circuit's opinion in *Burton v. Downey et al.*, the Court will adopt the defendants' finding that Adell transferred to FLCI in light of his difficulty "getting along" with OSCI medical staff. No. 14-3591, slip op. at 10 (7th Cir. Oct. 8, 2015) (citing *Scott v. Harris*, 500 U.S. 372, 380 (2007) ("[W]hen opposing parties tell two difference stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the fact for purposes of ruling on a motion for summary judgment.").

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 3 of 26   Document 29

medical personnel.[6] (Docket #22 Ex. 1 at 6-7, 10-15). He likewise has a pattern of refusing medical treatment. (Docket #21 ¶ 40). Adell states that he has no history of being "cited" for violent behavior (Docket #23 at 2), and the defendants do not dispute this.

FLCI is a medium security institution located in Fox Lake, Wisconsin. (Docket #21 ¶ 1). The defendants are employed at FLCI. (Docket #21 ¶¶ 1, 26, 42; Docket #20 at 1-2). Larson is a physician; Holly Meier ("Meier") is the HSU manager; Jody DeRosa ("DeRosa") is the Bureau of Health Services ("BHS") Nursing Coordinator; and Randall Hepp ("Hepp") is the Warden. (Docket #21 ¶¶ 1, 26, 42; Docket #20 at 1-2).

FLCI does not maintain a specific, written policy related to the presence of security staff during medical appointments. (Docket #21 ¶ 5). However, according to the defendants, security staff are present throughout the institution at any given moment and may be called upon by any staff person for any reason, including medical staff. (Docket #21 ¶ 5). This is particularly true when staff feel safety or security are a concern. (Docket #22 ¶¶ 7-10).

### 1.2    Adell's Medical Visits at FLCI

Upon Adell's arrival to FLCI, an initial medical screening indicated that Adell had not had a physical exam since April 6, 2004. (Docket #21 ¶ 12).

---

[6]For example, Adell's medical records indicate that on at least one occasion prior to leaving OSCI Adell "required security force to leave [the] HSU." (Docket #21 ¶ 26; Docket #22 Ex. 1 at 6). Though, as Adell points out (Docket #23 at 18), this entry was later modified to clarify that Adell did not require "hands on removal," Adell was "asked to leave HSU several [times] and required Officer Hafferman to assist." (Docket #22 Ex. 1 at 8). Beyond this, Adell's medical record is replete with entries that characterize him as "angry," "agitated," "uncooperative," and "argumentative." (Docket #22 Ex. 1 at 6-7, 10-15).

That same day, Adell submitted a Health Services Request ("HSR") for an appointment with a physician to discuss his care plan. (Docket #21 ¶ 15). Prison staff received the HSR on March 13, 2014, and scheduled Adell to see a physician. (Docket #21 ¶ 15).

Adell filed another HSR on March 15, 2014, this time to request an intake screening. (Docket #21 ¶ 16). Prison staff received Adell's second HSR on March 17, 2014 (Docket #21 ¶ 16), and reminded Adell that he was scheduled to see a physician.[7] (Docket #21 ¶ 16).

On March 18, 2014, Adell followed up with a letter to the HSU. (Docket #21 ¶ 17). He stated that he hoped that the "prior neglect" that he had received at OSCI would not continue and that he would like to have an appointment with an physician "ASAP." (Docket #21 ¶ 17). Later that day, Adell refused a weight check. (Docket #21 ¶ 18). In response, Adell wrote a second letter to the HSU asking medical staff not to "call me to HSU for medical testing *i.e.,* weight checks, labs, BP et al, unless I am seen by a RN or MD armed with sufficient info regarding the reason for such. I will not submit to any testing whatsoever without adequate info in advance." (Docket #21 ¶ 20).

Adell's first appointment with a physician at FLCI was scheduled for March 25, 2014. (Docket #21 ¶ 21). According to Adell's medical records and

---

[7]Neither the plaintiff's nor the defendants' proposed findings of fact indicate who made this initial appointment and how that appointment was communicated to Adell. Regardless, these facts are immaterial to the issues in this case.

Page 5 of 26

Larson's testimony, upon arrival Adell refused to cooperate with the medical assistant for a weight check.[8] (Docket #21 ¶ 21).

When Adell approached the medical exam room, he noticed a guard posted outside the door. (Docket #23 ¶ 2). Larson admits that he had asked for a security guard to stand outside the exam room door during this appointment with Adell. (Docket #21 ¶ 22). However, the parties dispute the reason why Larson made this request. On the one hand, Larson states in his declaration that he requested security presence for two reasons: (1) Adell's "disruptive and disrespectful behavior" on that day (Docket #22 ¶ 23); and (2) Adell's behavioral history as reflected in his medical file. (Docket #21 ¶ 24; Docket #22 ¶ 25). These facts made Larson believe that a security presence was necessary to ensure his safety and the safety of other HSU staff. (Docket #21 ¶ 24; Docket #22 ¶ 25). Adell, on the other hand, claims that the guard was present to serve as a "witness" and to retaliate against, intimidate, and harass him "for lodging legitimate complaints against the defendants and their DOC medical system." (Docket #23 at 17, 19). Adell presents no evidence of having complained of FLCI's medical services prior to his March 23, 2014 appointment. In his brief, however, he frequently alludes to having complained about medical treatment at OSCI. (*See, e.g.*, Docket #23 at 15).

Per Larson's request, a security officer stood in the hallway outside the exam room during Adell's first appointment. (Docket #21 ¶ 23). The

---

[8] The Court notes that according to the defendants' findings of fact and Larson's declaration, Adell presented on March 25, 2014 "shouting and refusing to cooperate" with HSU staff. (Docket #21 ¶ 21; Docket #22 ¶ 22). However, the medical records state only that Adell refused his weight check, not that he was shouting. (Docket #22 Ex. 1 at 8).

defendants admit that the officer was close enough to the exam room to see the events occurring inside. (Docket #21 ¶ 23). But, they also state that the guard would have likely had difficulty hearing conversations going on in the exam room at normal conversation volume, though would have heard shouting and loud noises. (Docket #21 ¶ 23). Adell alleges that the security guard was present "long enough to observe and overhear medical communications." (Docket #23 at 17). When Adell noticed the security guard outside the examination room door, he ended the appointment. (Docket #21 ¶ 25).

That same day, Adell wrote a letter to Meier complaining about this alleged breach of confidentiality. (Docket #21 ¶ 26). Meier responded two days later stating that Adell had been transferred to FLCI "due to the concern that [he] did not adhere to the care plans at OSCI and did not work with [his] health providers." (Docket #21 ¶ 26). In addition, she indicated that Adell's next appointment would be set for April 2, 2014, wherein she would "be available…so that your health concerns are addressed." (Docket #21 ¶ 26).

When Adell arrived for his April 2, 2014 appointment, he again refused his weight check and appeared "angry [and] upset." (Docket #21 ¶ 28). It is unclear whether a security guard was stationed outside the door of the exam room (Docket #23 at 6), or whether a guard was making rounds in the hallways (Docket #21 ¶ 29).[9]

According to Larson, Adell presented at the April 2, 2014 appointment as "hostile, agitated, and argumentative." (Docket #21 ¶ 32). Adell inquired

---

[9]As explained in her March 27, 2014 letter, Meier was also present so that she could assist in the event Adell had a specific question about BHS dietary policies. (Docket #21 ¶¶ 26, 30).

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 7 of 26   Document 29

as to why Larson needed to have other staff available during the appointment. (Docket #21 ¶¶ 32-34). Larson responded that Adell could "have as much privacy as his behavior would allow," and that until Larson was comfortable being in an exam room alone with Adell, at least one other HSU staff or security officer would be present. (Docket #21 ¶ 33). At some point during this exchange, Larson alleges that Adell became upset about the security guard who was, according to the defendants, making rounds in the hallway, and, according to Adell, posted at the door. (Docket #21 ¶ 36; Docket #23 at 6). Mid-conversation, Adell terminated the appointment. (Docket #21 ¶ 34). Because Adell terminated the appointment, Larson did not conduct an evaluation and did not provide care plan recommendations to Adell. (Docket #21 ¶ 37).

In light of Adell's complaint regarding the alleged privacy violations, FLCI reviewed its practice of having health staff or security officers present during health appointments. (Docket 21 ¶ 42). According to DeRosa,

> [i]t is not a violation of an inmate patient's confidentiality rights to have additional health staff and/or officers present when a determination has been made by health and correctional staff that the inmate patient presents a safety risk to self or others. In a correctional setting, concern about the safe and secure operation of the facility permit the presence of more than one health provider and/or correctional staff during the examination of the patient. All employees receive confidentiality training as required by HIPAA[sic] regulations.

(Docket #21 ¶ 42).

2.    LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*,

778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

When analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Hotel 71 Mezz*, 778 F.3d at 603. When a court denies a motion for summary judgment it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

3.    DISCUSSION

3.1    Eighth and Fourteenth Amendment Rights to Privacy

Though incarceration does not automatically extinguish all constitutional protections, the Constitution does tolerate certain restrictions on inmates' rights due to the circumstances of confinement. *Beard v. Banks*, 548 U.S. 521, 528 (2006). As such, while prisoners maintain a limited right of privacy (*see Smith v. Fairman*, 678 F.2d 52 (7th Cir. 1982) (per curiam); *Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994)), it is widely accepted that inmates "cannot enjoy greater privacy protections than individuals in free society."

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 9 of 26   Document 29

*Franklin v. McCaughtry*, 110 F. App'x 715, 719 (7th Cir. 2004) (citing *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)). Prisoners "at best have very limited privacy rights." *Id.* at 718.

A personal right of information privacy first took on constitutional dimension in *Whalen v. Roe* when the Court discussed "the individual['s] interest in avoiding disclosure of personal matters...." 429 U.S. 589, 599-60 (1977). With respect to medical records, there is wide divergence in how courts approach an inmate's right to privacy. *Compare Doe v. Delie,* 257 F.3d 309, 314 (3d Cir. 2001) (holding that "the Fourteenth Amendment protect[s] an inmate's right to medical privacy, subject to legitimate penological interests") *with J.P. v. DeSanti*, 653 F. 2d 1080, 1087-91 (6th Cir. 1981) (finding "that the Constitution does not encompass a general right to nondisclosure of private information"). *But see Moore v. Prevo*, 379 F. App'x 425, 428 (6th Cir. 2010) (holding that "inmates have a Fourteenth Amendment privacy interest in guarding against disclosure of sensitive medical information from other inmates subject to legitimate penological interests"). Whether, and to what extent, an inmate retains a Constitutional right of privacy in his/her medical records is an open question in the First, Fourth, Seventh, and Eighth Circuits. *See Nunes v. Massachusetts Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014)*; Massey v. Helman*, 196 F.3d 727, 742 n.8 (7th Cir. 1999); *Peace v. Kemper*, No. 14-CV-1416-PP, 2015 WL 5445795, at *5 (E.D. Wis. Sept. 15, 2015) (citing *Franklin,* 110 Fed. Appx. at 71); *Rollins v. Miller*, No. 1:12-CV-298-RJC, 2012 WL 4974966, at *2 (W.D.N.C. Oct. 17, 2012) (citing *Moore v. Mabus*, 976 F.2d 268, 271 (5th Cir. 1992)); *Richey v. Ferguson*, No. 05–5162, 2007 WL 710129, at *22 (W.D. Ark. Mar. 6, 2007).

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 10 of 26   Document 29

Courts that have extended a constitutional right to privacy for prisoners have done so only where the medical information pertained to some "excruciatingly" or "intensely" private circumstance, such as an HIV positive status or transsexual identity. *See Doe*, 257 F.3d at 317; *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir. 1999*); Doe v. Beard,* 63 F. Supp. 3d 1159, 1165 (C.D. Cal. 2014); *cf. Franklin,* 110 F. App'x at 719 (finding no right of privacy when a prisoner complained of having to discuss "a cancerous finger sore, diabetes, the need for eyeglasses, and other fairly pedestrian maladies" in the presence of other inmates and prison staff). Furthermore, an inmate's "interest in the privacy of medical information will vary with the condition." *Id.* (citing *Schriver*, 175 F.3d at 111).

A claimed right to information privacy can be rooted in both the Eighth and Fourteenth Amendments. *See Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995). The standard for evaluating a Fourteenth Amendment violation is largely the same for an Eighth Amendment violation. *See Salas v. Grams,* No. 09-CV-237WMC, 2010 WL 2757322, at *3 (W.D. Wis. July 13, 2010) (citing *Simpson v. Joseph*, 2007 WL 433097, at *13 (E.D. Wis. 2007)). Under the Fourteenth Amendment, prison administrators may restrict the constitutional rights of inmates through regulations that are "'reasonably related to legitimate penological interests.'" *Beard,* 548 U.S. at 126 (quoting *Turner,* 482 U.S. at 87). Under the Eighth Amendment, a plaintiff must show "calculated harassment unrelated to prison needs." *Johnson v. Phelan*, 69 F. 3d 144, 147 (7th Cir. 1995).

*Turner* also sets forth various factors that the Court should consider to "determin[e] the reasonableness" of Larson's conduct at FLCI: (1) whether the decision to rely on additional security during Adell's appointments was

rationally related to a legitimate government objective;[10] (2) whether there were alternate means for Adell to exercise his purported rights; (3) the impact that accommodating Adell's asserted right would have on the guards, prison staff, or resources; and (4) whether there were readily available alternatives to Larson's decision. *Beard*, 548 U.S. at 529 (citing *Turner,* 482 U.S. at 89); *Russell v. Richards,* 384 F.3d 444, 447-48 (7th Cir. 2004).

The Court finds that Larson's reliance on security presence during Adell's medical appointments did not violate Adell's purported right to medical privacy.[11] Larson specifically requested heightened security in the HSU in light of Adell's history of aggression and difficulty cooperating with medical staff. (Docket #21 ¶ 24; Docket #22 ¶ 25). Taking the facts in the light most favorable to Adell, even if Adell was not "disruptive and disrespectful" during his appointments, Larson had legitimate grounds to call upon security for safety purposes based on Adell's prior conflicts with medical staff. As reflected in Meier's follow-up letter to Adell on March 27, 2014, at least one of the reasons why Adell was transferred to FLCI from OSCI was his inability to "get along" with care providers. (Docket #21 ¶ 26). This

---

[10]The level of security provided by FLCI staff was not the same at the first appointment as the second appointment, though Adell and the defendants dispute this fact. Adell maintains that a guard was posted at the door during both appointments. (Docket #23 at 17). The defendants assert that the guard was posted at the door for only the first appointment; the security guard was merely "making rounds" for the second. (Docket #21 ¶ 29). Taking the facts in the light most favorable to the plaintiff, the Court will assume that, for at least some period of time, a guard was stationed outside the door of Adell's exam room on both occasions.

[11]For the purposes of this section, the Court will confine its opinion to discussing defendant Larson's liability. The Court will address the liability of Hepp, Meier, and DeRosa in a separate section below. (*See infra* Part 3.2).

tension with HSU staff at OSCI is well documented in Adell's medical records. (*See* Docket #21 ¶ 26; Docket #22 Ex. 1 at 6-7, 10-15) (characterizing Adell as "angry," "agitated," "uncooperative," and "argumentative").

Institutional security has been described as "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003); *see also Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001) (holding that an inmate's "constitutional right [to privacy in medical information] is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security"); *Salas*, 2010 WL 2757322, at *3 (granting summary judgment to a prison that provided care to inmates in a large, open "day room" for security reasons); *Simpson*, 2007 WL 433097, at *13 (upholding a prison's policy to station an officer in a segregated inmate's exam room for purposes of doctor safety). Regardless of whether Adell presented as "argumentative and uncooperative" on the days of his appointments, in light of Adell's documented temperament towards medical staff, Larson had a reasonable basis to ask for additional security during Adell's appointments.

Though Adell disputes that he posed a security threat, his medical records paint a very different picture of his behavior at OSCI. (Docket #22 Ex. 1 at 6-7, 10-15). Adell's records show that his interactions with medical staff were often contentious, heated, and, on at least one occasion, required the intervention of security staff. (Docket #22 Ex. 1 at 6-7, 10-15). Because Adell was a new patient, whose temperament was yet unknown to FLCI's treating physicians, Larson's concerns about Adell's behavior were particularly acute. Thus, the Court finds that Adell's allegation that guards were present merely to "harass" and "retaliate against" him is unsupported by any evidence and

unpersuasive. (*See also supra* Part 3.3). Larson's decisions to rely on additional security outside the door of the exam room during Adell's first two appointments at FLCI were in furtherance of the legitimate penological aims of maintaining security, safety, and order in the HSU.

Moreover, the potential topics of conversation during the appointments, *i.e.,* Adell's conditions, were not "intensely" private. *See Franklin,* 110 F. App'x at 719. Though Adell suffers from a range of health related conditions, including celiac's disease, iron deficiency, anemia, hiatal hernia, and prior drug abuse, none of these conditions come anywhere near to the level of "intensely" personal information that have given rise to viable privacy claims. *See, e.g., Doe*, 257 F.3d at 317 (HIV positive status); *Powell,* 175 F.3d at 112 (transsexual identity*)*; *cf. See Franklin,* 110 F. App'x at 719 (finding that "the semi-public discussion" of a "cancerous finger sore, diabetes, the need for eyeglasses, and other fairly pedestrian maladies" would not "transgress the constitutional right to information privacy insofar as that right might extend to prisoners"); *Rodriguez v. Ames,* 287 F. Supp.2d 213, 220 (W.D.N.Y. 2003) (finding that a physician did not violate a prisoner's privacy interest when he conducted a medical exam for rectal conditions in the presence of a cell mate); *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000) (finding no privacy violation when police subpoenaed the prisoner's medical records that contained information about various genital conditions). Therefore, the Court finds that Adell's medical information was not "intensely private" so as to overcome Larson's reasonable concern for institutional safety and order during the appointments.

Adell argues that an inmate's right to medical privacy turns on the security level associated with the particular prisoner. (Docket #23 at 5-6).

Specifically, he cites to *Simpson* for the proposition that the rights of inmates in *segregated* confinement are subject to more limitations in light of their circumstances, while the rights of general population inmates are not. (Docket #23 at 5-6). However, *Simpson*'s holding did not rest on the fact that the inmate alleging constitutional wrongdoing was in segregated confinement. *See Simpson*, 2007 WL 433097, at *13-16. The Court, recognizing that the issue of an inmate's privacy in medical records was an open question in the Seventh Circuit, relied on the fact that the defendants presented unrefuted evidence that the "requirement that disciplinary status inmates have an escort during their medical appointments serves a *security* function." *See Simpson*, 2007 WL 433097, at *15 (emphasis added). Like the case at bar, there was no evidence to suggest that the security policy was "solely intended to inflict pain or to harass the plaintiff." *Id.* Likewise, many courts faced with this question have not endorsed the notion that limitations on an inmate's right to medical privacy should only apply to inmates in segregated confinement. *See, e.g., Franklin,* 110 F. App'x at 719; *Rodriguez,* 287 F. Supp.2d at 220; *Richey,* 2007 WL 710129, at *24; *Patin v. LeBlanc et al.,* No. 11-3071, 2012 WL 3109402, at * 21 (E.D. La. May, 18, 2012).

Lastly, the Court must evaluate the reasonableness of Larson's actions under the *Turner* factors. 482 U.S. at 89. The lack of suitable alternatives for prison staff, and the consequences associated with accommodating Adell's right to privacy, support the Court's conclusion that Adell does not allege meritorious constitutional claims. It appears that what Adell seeks is a private, closed-door meeting with a physician. However, the security guards in this case were, at their closest, posted outside Adell's exam room door. (Docket #21 ¶ 22, 29). They were not inside the room, nor involved in the

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 15 of 26   Document 29

treatment process. The only other alternatives that the FLCI staff had were to patrol the general HSU area (which they indeed may have done during Adell's second appointment) or rely on no security at all. Though Adell asserts, and the defendants do not confirm, that HSU staff are armed with "body alarms" (Docket #23 at 10), having security merely patrol the area, if at all, might not permit the guards to react quickly and efficiently in the event an inmate becomes hostile or disorderly. Having no security at all would pose a substantial and unwarranted risk to the safety and order of the HSU. Thus, accommodating Adell's request would only put HSU staff in potential danger. Larson's reliance on additional security outside of, or near to, the exam room during Adell's appointments accommodated Adell's right to privacy in a reasonable manner and in alignment with legitimate penological concerns.

The Court recognizes that a prisoner's right to medical privacy may change based on the circumstances. *See Franklin,* 110 F. App'x at 719. The circumstances in Adell's case, however, indicate that he was transferred to FLCI based on difficulty "getting along" with medical staff. (Docket #21 ¶¶ 11, 26). Moreover, Adell's medical records suggest a contentious, argumentative, and sometimes hostile relationship between Adell and medical staff members. (Docket #22 Ex. 1 at 6-7, 10-15). Adell's conditions were not "intensely private" and there is no suggestion in the parties' findings of fact or the record showing that Larson's conduct was intended to inflict pain or to harass Adell. Thus, the undisputed facts show that Larson reasonably relied on additional security near Adell's medical exam rooms for legitimate security purposes, and the defendants are, therefore, entitled to summary judgment on Adell's Fourteenth and Eighth Amendment claims.

3.2    Hepp, Meier, and DeRosa Are Not Liable Because they Did Not Cause or Participate in the Alleged Violations

Adell claims that defendants Hepp, Meier, and DeRosa are liable to him for violating his First, Eighth, and Fourteenth Amendment rights. Specifically, he argues Meier and DeRosa are liable because they "learned of," "participated in," and "failed to take corrective action" in the alleged constitutional violations. (Docket #23 at 21). Adell alleges that Hepp did not "participate in" the violations, but instead "learned of" them and "failed to take corrective action." (Docket #23 at 21).

"Liability under § 1983 arises only when the plaintiff can show that the defendant was personally responsible for a deprivation of a constitutional right." *Zentmeyer v. Kendall County*, 220 F.2d 805, 811 (7th Cir. 2000); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). Moreover, in order to be liable for a failure to intervene, "there must be some causal connection or affirmative link between the action complained about and the official sued…." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

Under § 1983 there is no supervisory liability. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694 (1978). "This means that supervisors cannot be 'vicariously liable' for the conduct of their subordinates." *Watts v. Westfield*, No. 10-CV-550-WMC, 2014 WL 3447080, at *4 (W.D. Wis. July 11, 2014) (citing *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 2796 (2013)). A supervisory official only "satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent. That is, he must know about the conduct and facilitate it, approve

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 17 of 26   Document 29

it, condone it, or turn a blind eye." *Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011).

Adell's claims against Hepp, Meier, and DeRosa cannot stand for many reasons. First, without any underlying constitutional violation by Larson, Adell's claims against Hepp, Meier, and DeRosa for "failing to intervene" as supervisors, must also fail. *See, e.g.*, *Hart v. Mannina*, 798 F.3d 578, 596 (7th Cir. 2015), *reh'g denied* (Oct. 16, 2015) ("Because the district court properly dismissed Hart's claims against Detective Mannina and the other police officers who participated directly in the investigation leading to Hart's arrest, Hart's claims against several supervisory defendants and against the City of Indianapolis also fail."). Second, Adell does not put forth any facts suggesting how any of these defendants were personally responsible for stationing security guards outside of his exam room. There is simply no evidence suggesting that these individuals asked for, requested, or encouraged additional security to be present in the HSU during Adell's appointments. Even if Meier knew that security would be present during the second appointment, which she attended, there is no evidence showing that she played a role in securing, maintaining, or endorsing their presence. Third, Larson is explicit in his declaration that *he* was the person who asked for security during Adell's visits. (Docket #22 ¶ 23). There is no suggestion that the other defendants took any step to affirm, deny, or condone this request. Lastly, to the extent Adell is claiming that Meier, DeRosa, and Hepp are liable because they "failed to take corrective action," Adell's claim cannot stand because there is no supervisory liability under § 1983. *Monell*, 436 U.S. at 658. Thus, Adell's claims against Meier, DeRosa, and Hepp must be dismissed.

### 3.3    First Amendment Retaliation Claim

Adell argues that Larson relied on additional security during his medical visits in order to retaliate against him for filing medical grievances. (Docket #23 at 15-20).[12] This claim fails on both procedural and substantive grounds.

First, this claim is not properly before the Court from a procedural standpoint. The Court's screening order permitted Adell to go forward with Eighth and Fourteenth Amendment claims based on his privacy-oriented allegations. (Docket #9 at 7). Thus, the Court did not find that Adell stated a cognizable First Amendment retaliation claim from the outset. However, as Adell devoted a significant portion of his brief to that topic (Docket #23 at 15-20), and the defendants addressed the issue in their reply (Docket #27 at 4-6), the Court will address the merits of Adell's claim.

Second, the elements of a § 1983 claim of First Amendment retaliation require Adell to prove that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) a causal connection between the two." *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). In light of the potential abuse of institutional retaliation claims, the Seventh Circuit places a "high burden" on prisoners who make these claims. *See Babcock v. White*, 102 F.3d 267, 275 (7th

---

[12]Again, Adell does not specify whether this claim is directed towards Larson, Hepp, DeRosa, and/or Meier. Other than Meier's review of Adell's March 25, 2014 complaint, there is no evidence suggesting that Hepp, DeRosa, or Meier in any way "participated" in Larson's decision to ask for more security during Adell's appointments. As discussed above (*see supra* Part 3.2), these defendants cannot be liable merely for their supervisory responsibility, and as such the Court's opinion on this claim will be confined to discussing Larson's liability.

Case 2:14-cv-01277-JPS    Filed 11/02/15    Page 19 of 26    Document 29

Cir. 1996). A plaintiff "must establish that his protected conduct was a *motivating factor* behind" the alleged unconstitutional conduct. *Id.* (emphasis added). Moreover, the Seventh Circuit has "specifically expressed… disapproval of excessive judicial involvement in day-to-day prison management" in light of a commitment to "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (internal citations omitted) (internal quotation marks omitted).

Adell puts forth no evidence to support his theory that Larson had a "retaliatory motive" when he asked for additional security in the HSU during Adell's appointments, and thus Adell's retaliation claim cannot stand. Though Adell states that he was "prolific" in filing grievances at OSCI (Docket #23 at 6), there is no evidence linking these grievances at OSCI to his treatment at FLCI. Indeed, the Court has seen no evidence of prior administrative complaints filed by Adell other than that which was directed to Meier on March 25, 2014. (Docket #21 ¶ 26). Thus, assuming that Larson was acting in retaliation for that grievance would only be plausible, if at all, for the April 2, 2014 appointment.

While it may be reasonable to assume that Larson read Adell's medical chart prior to the appointments, which in turn alluded to strained relations between Adell and OSCI staff, there is no evidence to suggest that Larson knew of the administrative complaints that Adell filed while at OSCI. Nor is there evidence that Larson was aware of Adell's March 23, 2014 grievance. At bottom, therefore, there appears to be no causal link between the grievances that Adell filed while at OSCI, and/or the sole grievance that Adell filed at FLCI during the relevant time frame, and Larson's decision to

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 20 of 26   Document 29

ask for heightened security. As discussed at length above, Larson had legitimate penological interests in mind when calling upon the guards during Adell's appointments: institutional security, staff safety, and order in the HSU. In light of these reasonable bases, the Court finds no reason to insert itself into the "day-to-day prison management" decisions of the defendants as they occurred in this case. *Babcock*, 102 F.3d at 275.

In conclusion, Adell's First Amendment claim is procedurally improperly before the Court and, moreover, substantively without merit.

### 3.4 Qualified Immunity

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "As a defense, '[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably.'" *Watts*, 2014 WL 3447080, at *3 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Whether a defendant is entitled to qualified immunity is a question of law. *Llaguno v. Mingey*, 763 F.2d 1560, 1569 (7th Cir. 1985), *cert. dismissed*, 478 U.S. 1044 (1986).

Determining the applicability of qualified immunity involves a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). First, the court must decide whether "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, the court must determine whether,

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 21 of 26   Document 29

at the time of the violation, the right was clearly established. *Id.* The Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). To be clearly established, a right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, —U.S.—, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks omitted). To defeat a qualified-immunity defense, a plaintiff need not point to a case that is factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011).

The defendants are entitled to qualified immunity under *Saucier*. First, as discussed above, Adell does not state a cognizable violation of his constitutional rights. *See supra* Part 3.1-3.3; *see also Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 472 (7th Cir. 1997) (citing *Young v. Murphy*, 90 F.3d 1225, 1234 (7th Cir. 1996)). Second, an inmate's right to privacy in medical information is not established "beyond debate." *Id.* The Seventh Circuit has been explicit that this issue is an "open question." *See Massey*, 196 F.3d at 742 n.8. Moreover, while the Second and Third Circuits have found that inmates retain limited privacy rights in medical information, other courts of appeal, including the First, Fourth, and Eighth Circuits, have not. *Nunes*,

Case 2:14-cv-01277-JPS   Filed 11/02/15   Page 22 of 26   Document 29

766 F.3d at144; *Delie*, 257 F.3d at 309; *Powell*, 175 F.3d at 107; *Rollins*, 2012 WL 4974966, at *2; *Richey*, 2007 WL 710129, at *22.

Thus, the Court finds that the legal question of an inmate's right to medical information privacy is not "clearly established," and the defendants are, therefore, entitled to qualified immunity. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."); *see also Simpson*, 2007 WL 433097, at *17 (deciding that an inmate's right to medical information privacy was not clearly established) (citing *Donovan v. City of Milwaukee*, 17 F.3d 944, 953 (7th Cir. 1994) ("Because only two circuits had considered cases on point, reaching opposite results, we conclude that the relevant case law was still developing [and] the key issue in this case had not been clearly settled.")).

### 3.5    Standing

Lastly, the defendants argue that Adell lacks standing because he terminated his appointments with Larson prior to his disclosure of potentially private information. (Docket #20 at 9-10). Therefore, according to the defendants, as there was no injury, Adell has no standing to bring this case.

The standing requirement arises out of the Constitution's mandate that the judiciary only decide "cases and controversies." U.S. Const. art. III. § 2, cl. 1. "[T]he requirements of Article III case-or-controversy standing are threefold: (1) an injury in-fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court." *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "When the plaintiff

applies for prospective relief against a harm not yet suffered—or one he believes he will suffer again—he must establish that he 'is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and [that] the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical.'" *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted)).

"Chilled speech is, unquestionably, an injury supporting standing." *Bell*, 697 F.3d at 453. "Self-censorship" is a distinct "harm that can be realized even without an actual prosecution." *Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). "The chilling of protected speech may thus alone qualify as a cognizable Article III injury, provided the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them." *Id.* (internal quotation marks omitted). However, "a plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III." *Bell*, 697 F.3d at 453 (citing *Laird v. Tatum*, 408 U.S. 1, 11, 13–14 (1972)).

While Adell is ultimately incorrect regarding the extent of his privacy rights in this case, the Court finds that Adell does have standing to bring the current action. The defendants argued that because Adell terminated his appointments before disclosing private information, he suffered no injury and, therefore, does not have standing to sue. The defendants fail to recognize, however, that Larson's decision to rely on security guards near Adell's examination room "chilled" protected speech between Adell and his physician, thereby providing sufficient standing to bring this action. Adell's

fear was not merely subjective, as Larson admits that his decision to rely upon heightened security would continue as long Adell's behavior continued. (Docket #22 ¶ 33). Though an inmate's right to privacy does not extend so far as to entitle Adell to relief, the injury that he suffered as a result of the security guards' presence is sufficient to provide him standing.

On a final note, this Order and the judgment that follows are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty (30) days of the entry of judgment. *See* Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30–day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

In addition, under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within twenty-eight (28) days of the entry of judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

4.     CONCLUSION

Adell's claim to information privacy under the Eighth and Fourteenth Amendments must fail because Larson demonstrated a legitimate need for additional security during Adell's medical appointments. Moreover, there is no evidence to suggest that Larson relied on additional security due to a

retaliatory motive, and, as such, Adell's First Amendment claim also fails. Defendants Meier, Hepp, and DeRosa must be dismissed on the grounds that they did not actually participate in any of the alleged constitutional violations and are not liable under a theory of supervisory liability. They are likewise entitled to qualified immunity. While Adell does have standing to bring the asserted claims in this action, the undisputed facts show that the defendants did not violate Adell's First, Eighth, and Fourteenth Amendment rights, and are, therefore, entitled to judgment as a matter of law.

Accordingly,

IT IS ORDERED that the defendants' Motion for Summary Judgment (Docket #19) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits;

IT IS FURTHER ORDERED that the plaintiff's Motion to Supplement the Complaint (Docket #17) be and the same is hereby DENIED as moot;

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 2nd day of November, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge